IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DUSTIN E. ZUHLKE, | |
| Plaintiff, | **8:18CV295** |
| vs. | **MEMORANDUM AND ORDER** |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security; | |
| Defendant. | |

This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner"). Plaintiff, Dustin Zuhlke, appeals a final determination of the Commissioner denying his application for Social Security benefits. This court has jurisdiction under 42 U.S.C. § 405(g).

## I.     BACKGROUND

### A.  Procedural History and Introductory Information

On March 23, 2015, Mr. Zuhlke filed an application for disability benefits, alleging that he suffered from a disability beginning on October 7, 2014. His application was denied initially and upon reconsideration. Following a May 9, 2017 hearing, an administrative law judge ("ALJ") denied benefits. Filing No. 9, Social Security Transcript ("Tr.") at 38-75. On April 26, 2018, the Appeals Council denied review, and the ALJ's decision stands as the final decision of the Commissioner. *Id.* at 1-5. Zuhlke seeks review of the ALJ's order denying benefits.

Plaintiff is now forty years old. He has previous relevant work experience as a garbage collection manager, hardware store laborer, truck driver, semi-truck driver,

construction worker, building repairer, and feed miller. *Id.* at 30. Zuhlke has a high school education and can communicate in English. *Id.* He started a gun business out of his home which provided a gross income of $1,200 in 2016. *Id.* at 28, 56. At the time of Zuhlke's application for benefits, he contended that he was unable to work because he has two to three migraines per week resulting from a fall at work in May 2013. *Id.* at 177.

### B. Claimant's Relevant Testimony at the ALJ Hearing

At the hearing on May 9, 2017, Zuhlke testified that he and his wife are the parents of five young children. *Id.* at 45. His wife works part-time cleaning a bank for two hours each evening. *Id.* Since graduating from high school, Zuhlke has held numerous jobs of brief duration. After high school, he worked for farmers and ranchers sporadically for six years. *Id.* at 45-46. Following this, Zuhlke characterized himself as a self-employed contract hire who worked "helping other farmers." *Id.* at 46. Subsequently, he obtained a CDL commercial license and worked for his brother in a farming and truck driving business. *Id.* at 46-47. Zuhlke then did maintenance on his uncle's hog farm for approximately one year. *Id.* at 47. Following this, he worked at Kaylor Parkston Grain where he drove an eighteen-wheeler truck and maintained grain facilities. *Id.* Zuhlke thereafter was employed by OMNI Builders for approximately one year, for whom he helped build agricultural buildings. *Id.* at 48. After this, he was an operations manager with Waste Connections, a garbage company. *Id.* Zuhlke then spent a year as a feed mill manager for Christensen Farms and Feedlots. *Id.* at 48-49. Zuhlke testified that he was hired to work as an appliance installer at William Crowder in 2013, but "in between training [he] was tearing down a building," at which point he fell from a ladder and was injured. *Id.* at 49-50.

After the injury and consequent surgery, Zuhlke stated that he went back to work at William Crowder doing light duty work from August 2013 until January 2014, at which point he had another surgery. *Id.* at 50. In March 2014, Zuhlke again returned to William Crowder; this time he maintained the building and worked in a hardware store. *Id.* at 50-51. Zuhlke testified that his employment at William Crowder terminated in June 2014. *Id.* at 50. Additionally, from 2013—2015, Zuhlke worked "on the side" for Excel Development Group, a property management company, doing light work such as painting, mowing, and patching holes in walls. *Id.* at 52. Zuhlke stated that, when able, he helped on his brother's grain farm in exchange for help with his wife's car payment. *Id.* at 54.

Zuhlke testified that he was not looking for work at the time of the hearing. *Id.* As such, he maintained that "it's very hard to gain employment because my migraine headaches are unpredictable, and they're long-lasting sometimes." *Id.* at 54-55. At the time of the hearing, Zuhlke's only employment was the operation of a gun business out of his home; income from the business was insubstantial and not enough to support a family with five young children. *Id.* at 56. Thus, the family is on food stamps and Medicaid. *Id.* at 56-57. Zuhlke stated that he makes a house payment of $853 per month with his wife's income, which was approximately $1,500 per month. *Id.* at 57.

Regarding physical limitations, Zuhlke testified that he cannot perform repetitive tasks, as they bring on migraines. *Id.* He stated that there were days where the migraines would interfere with doing even part-time work. *Id.* at 58. There were instances when he could not complete a task for several days because of crippling migraines. *Id.* Additionally, Zuhlke contended that he dealt with tingling in his hands. *Id.* at 58-59. The tingling was often a precursor to migraines. *Id.* at 59. At the onset of such tingling, Zuhlke

took medications to prevent an oncoming migraine, but the medications were often ineffective. *Id.* The tingling resulted in problems with gripping or manipulating objects – such as holding a pen or trying to write. *Id.*

Zuhlke also discussed his depression, which "really took off" after the migraines began and he could not find work. *Id.* Zuhlke stated that his depression worsened when he was not able to support his family or take care of his home. *Id.* at 60. Zuhlke testified that he takes Zoloft for depression and Wellbutrin, Propranalol, Toradol, Maxalt, Zomeg, Relpax, and Phenergan for migraines. *Id.* at 60-61. These medications were prescribed by Dr. Adams, a neurologist Zuhlke first saw in March of 2015. *Id.* at 61. Zuhlke saw another neurologist, Dr. Asaad, in Norfolk, Nebraska. Dr. Asaad said that Botox for migraines is an option, and she encouraged Zuhlke to do physical therapy, but Zuhlke testified that his neurosurgeon, Dr. Bowdino, advised against physical therapy. *Id.* at 61-63.

When asked about the frequency of the headaches, Zuhlke responded that they "happen whenever they want." *Id.* at 63. The migraines occurred two to three times per week; sometimes they began and woke him up in the middle of the night. *Id.* A typical migraine, Zuhlke testified, lasted about thirty-six hours. He stated that these particularly severe migraines typically occurred at least once or twice per week, and the pain kept him awake because the medications did nothing to ease the pain. *Id.* at 63-64. Zuhlke testified that his wife's parents cared for the children when migraines left him incapable. *Id.* at 64.

Zuhlke said he tried to obtain a CDL license to haul grain in May 2016, but due to medications he did not qualify. *Id.*

When asked about the source of his migraines, Zuhlke responded that he never had migraines prior to the work accident. *Id.* at 65. He testified that the migraines result in problems remembering things, concentrating, and comprehending. *Id.* One of the medications made him foggy, and thus unable to concentrate. *Id.* at 65-66. Additionally, the after effects of the migraines sometimes resulted in memory loss, as Zuhlke stated that he "had entire conversations after [he] had a migraine, and [he did not] remember them." *Id.* at 66. When asked to describe the quality of his sleep, Zuhlke testified that he often spent entire nights without sleep – as sleep escaped him, he laid awake and tried to figure out what he was going to do. *Id.*

### C. Claimant's Relevant Medical History

Zuhlke's health records indicate that he visited the emergency room at Avera St. Anthony's Hospital in O'Neill, Nebraska on May 15, 2013. *Id.* at 289. He arrived at the emergency room via squad, on a backboard and with a neck collar in place, for evaluation of neck pain. *Id.* Zuhlke stated that he was at work at William Crowder, on top of a ladder attempting to remove a nail from a roof when he lost his balance and fell off the ladder. *Id.* He hit the right side of his head on the cement. *Id.* On May 16, 2013, Dr. Bradley Bowdino and Dr. Joseph Cheattle performed an operation on Zuhlke to repair a type 2 odontoid fracture. *Id.* at 413. The procedure performed was the placement of an odontoid screw fixation in the C2 vertebra. *Id.*

On August 7, 2013, Zuhlke visited the Avera Medical Group clinic for evaluation of pain in his right shoulder blade. *Id.* at 341. He also stated that he developed muscle spasms lateral to his upper thoracic spine and medial to his scapula. *Id.* Hydrocodone

provided little improvement. *Id.* Dr. Matthew Winkelbauer, Zuhlke's general practitioner, provided Flexeril 10 mg to be taken every eight hours. *Id.* at 342.

On August 14, 2013, Dr. Bowdino noted that a CT scan of the repair of Zuhlke's odontoid fracture showed incomplete healing. *Id.* at 397. On December 11, 2013, Dr. Bowdino stated that Zuhlke's 2013 operation failed to fuse the odontoid, and a bone growth stimulator provided no significant change. *Id.* at 396. Thus, Bowdino recommended that Zuhlke undergo a C1-C2 fusion with "C1 lateral mass screws and laminar screws at C2." *Id.*

On December 23, 2013, Zuhlke presented at the Avera Medical Group clinic for evaluation of mid thoracic back pain. *Id.* at 335. The pain was just left of his mid thoracic spine. *Id.* Zuhlke maintained that the pain increased when he bent, twisted, or pulled his shoulders back. *Id.* Tylenol did not provide symptom relief, so Dr. Winkelbauer again provided Flexeril 10 mg to be taken every eight hours. *Id.* at 335-336.

On January 8, 2014, Zuhlke went to the Avera Medical Group clinic for a pre-operative surgery visit. *Id.* at 332. He was scheduled to have a posterior cervical fusion with Dr. Bowdino on January 13, 2014, secondary to nonhealing of his C2 fracture, which was originally sustained in May 2013. *Id.* at 332-333. On January 13, 2014, because of his non-healed type II odontoid fracture, Zuhlke underwent a surgical procedure performed by Dr. Bowdino, which consisted of (1) lateral mass instrumentation of CI and C2 lamina instrumentation bilaterally; and (2) placement of structural hip graft for arthrodesis C1-2. *Id.* at 405.

On February 26, 2014, Dr. Bowdino described Zuhlke's cervical fusion with a hip autograft and insisted that Zuhlke, as a whole, was doing well, as his incisions were

healing, and his pain was under control. *Id.* at 394. On April 9, 2014, Dr. Bowdino described an episode following the 2013 fusion surgery in which Zuhlke had severe pain on the right side of his neck while doing extensive work. *Id.* at 388.

On March 26, 2014, Zuhlke presented at the Avera Medical Group clinic for a follow-up of his neck pain. *Id.* at 324. The nurse's notes reveal that Zuhlke returned to work on March 1, 2014, at William Crowder's, and had not been doing any heavy lifting. *Id.* The pain was in the lateral aspect of the right side of his neck and on the top of his shoulder, and he that reported Flexeril provided no relief. *Id.* Zuhlke also reported taking Hydorcodone four times daily. *Id.*

On June 26, 2014, Dr. Bowdino stated:

[Zuhlke] underwent both an anterior and posterior stabilization of his cervical spine. He is now doing well. He has good relief of his pain. He is neurologically intact and has made good progress over the past two months with regard to his work. He was been very active and busy at work. I am going to plan to release him to full work with a maximum lifting of 150 pounds.

*Id.* at 386. On August 5, 2014, Dr. Bowdino stated that as of June 26, 2014, Zuhlke was at maximum medical improvement. *Id.* at 384. Further, regarding permanent impairment rating, he was at 12% of the body as a whole for the fracture and repair. *Id.* [1]

On September 5, 2014, Zuhlke visited the Avera Medical Group clinic for his annual physical. *Id.* at 320. Dr. Winkelbauer provided the following daily medications: Sertraline 100 mg, Fenofibrata 134 mg, Cyclobenaprine 10 mg, Hydrocodone 7.5 mg, and a CPAP machine. *Id.* at 317-318. At this appointment, Zuhlke complained neither of neck pain nor migraines.

---

[1] Based on AMA guides. *See* Guides to the Evaluation of Permanent Impairment, 404 (5th ed. 2000).

On October 7, 2014, Zuhlke visited the Avera Medical Group clinic with complaints of headaches and hand numbness. *Id.* at 380. He stated that for approximately the past month he suffered from headaches that started at the base of his neck and wrapped around his head in a hatband pattern. *Id.* He said that hand numbness preceded his headaches. *Id.* Tylenol, Ibuprofen, and Excedrin were all ineffective, so Terra Drueke, APRN, prescribed Fioricet tablets to be taken at the onset of migraines. *Id.*

Zuhlke went to the Avera Medical Group clinic on November 8, 2014, with complaints of a migraine headache which started at approximately 11:00 p.m. the night prior. *Id.* at 436. He stated that he took Fioricet and hydrocodone throughout the night with no relief. *Id.* He complained of photophobia, phonophobia, and nausea. *Id.* Jenna Thiele, APRN gave Zuhlke a shot of Toradol 60 ml, renewed his Fioricet prescription, and prescribed Imitrex 50 mg to be taken at the onset of a headache. *Id.* at 437.

On November 10, 2014, Zuhlke presented at the Avera Medical Group clinic for evaluation of his migraines, which he stated he had a couple of times per week for a couple of months. *Id.* at 432. Dr. Winkelbauer prescribed Amitriptyline 25 mg and advised him to continue taking the Fioricet and Imitrex prescriptions as needed, in addition to Advil 800 mg every eight hours. *Id.* at 433.

On December 10, 2014, Dr. Bowdino stated that Zuhlke was fully healed (following the 2013 odontoid fracture repair which did not heal and the resulting 2014 C1-2 cervical fusion). *Id.* at 383. Bowdino released Zuhlke "back to full activity without restriction." *Id.*

On December 16, 2014, Zuhlke went to the Avera Medical Group clinic with complaints of chronic migraines. *Id.* at 428. Zuhlke came to the clinic because he had a migraine and, even though he took four Fioricet, experienced little relief. *Id.* Zuhlke

declared that he continued to take Amitriptyline at night but was out of Imitrex. *Id.* Emily Nolan, NP gave him a shot of Toradol 60 ml, advised him to continue taking amitriptyline and Fioricet, and encouraged him to take Advil every eight hours as needed. *Id.* at 429.

On January 30, 2015, Zuhlke presented at the Avera Medical Group clinic with complaints of a migraine; at the time of the visit, he was in the midst of an ongoing two-day migraine. *Id.* at 424. He was sensitive to light, but not nauseous. *Id.* Zuhlke was given a shot of Demerol 75 ml, and Ms. Drueke renewed his prescriptions for Fioricet and Amitriptyline. *Id.*

On February 11, 2015, Zuhlke again presented at the Avera Medical Group clinic for migraines. *Id.* at 420. He stated that the previously prescribed Elavil 25 mg helped, and he did not have a migraine for a month, but they had recently started returning. *Id.* Zuhlke was unsatisfied with previously prescribed Fioricet, which does help, but "just kind of covers [the migraines] up." *Id.* He also complained of photophobia, phonophobia, and nausea with his migraines. *Id.* Dr. Winkelbauer prescribed Imitrex 100 mg daily for migraines. *Id.* at 421.

On March 18, 2015, Dr. C. Robert Adams, a board-certified neurologist, saw Zuhlke "for evaluation of persistent and bothersome headaches" at the Skyview Medical Center in Norfolk, Nebraska. *Id.* at 516. Dr. Adams found that Zuhlke's migraines and arm numbness were a result of the May 15, 2013 fall off the ladder. *Id.* at 518. Adams provided Zuhlke with several recommendations, which included: avoid physical therapy and/or chiropractic manipulation of neck and/or lower back, do not have Botox injections or cervical epidurals, and continue propranolol. *Id.* Adams gave Zuhlke Decadron 40 mg

and Toradol 60 mg intravenously and prescribed Toradol 10 mg and Phenergan 25 mg. *Id.*[2]

Dr. Adams again evaluated Zuhlke on April 14, 2015. *Id.* at 512. He advised him to continue Zoloft 100 mg daily, and he prescribed Cymbalta 30 mg daily to aid with pain control. *Id.* at 513. Additionally, Dr. Adams prescribed Zuhlke Toradol and Phenergan "as needed for breakthrough headache." *Id.* Zuhlke called Dr. Adams's office on April 28, 2015, during a migraine and requested a refill of Toradol, which Dr. Adams provided. *Id.* at 622. Dr. Adams also prescribed Zomig 5 mg to be taken no more than six times per week. *Id.*

Dr. John J. Curran, Ph.D. conducted a psychological interview with Zuhlke on May 19, 2015. *Id.* at 526. The psychological report indicated that Zuhlke made ten to fifteen applications for employment and had a couple of interviews, but "when [Zuhlke] tells [potential employers] that he has migraine headaches, and cannot predict their occurrence, usually he does not get a call back." *Id.* at 528. The report stated that Zuhlke's migraines started in January of 2014, were at their worst in September of 2014, and at the time of the interview they occurred about two times per week and lasted a couple of hours after Zuhlke took medications and a nap. *Id.* at 529. The report further stated that Zuhlke affirmed he was able to work on days when he did not have a migraine. *Id.* at 530. The report noted that antidepressant medication is quite helpful in managing Zuhlke's depression symptoms, and a recent change from Zoloft to Cymbalta helped with pain control. *Id.* Additionally, the report declared that Zuhlke's sleep quality was poor,

---

[2] Dr. Adams administered intravenous doses of Decadron 40 mg and Toradol 60 mg to Zuhlke at subsequent appointments. *See* Tr. at 513, 614, 620, 640, 644, 647, 651, 653. On one occasion, Toradol was administered intramuscularly rather than intravenously. *See* Tr. at 656.

his concentration varied depending on pain, and he was "disappointed and saddened by his lack of being able to be productive." *Id.* Further, the report noted that Zuhlke was well-oriented, pleasant toward the examiner, fully cooperative, and he understood all questions posed and gave coherent responses. *Id.* at 531.

The report declared, inter alia, that there were no restrictions on Zuhlke's activities of daily living, no difficulties in maintaining social functioning, and he could understand and remember simple instructions and carry them out. *Id.* at 532. Dr. Curran provided Zuhlke with the following diagnoses: depressive disorder, nicotine dependence, migraine headaches, high cholesterol and triglycerides, acid reflux, sinus problems, mild arthritis, minimal income, minimal employment, and financial struggles, and gave him a GAF score of 75.[3] *Id.*

Dr. Adams again evaluated Zuhlke on June 8, 2015. *Id.* at 619. Dr. Adams noted that Zuhlke still had headaches often and his eyes, face, and temple were sensitive to touch and to light. *Id.* Dr. Adams prescribed Trazodone 100 mg daily for restless sleep. *Id.* at 620.

On July 6, 2015, Zuhlke's migraine was so intense that he went to the emergency room at Avera St. Anthony's Hospital and was admitted. *Id.* at 561. Zuhlke stated that he could not control the migraine at home with his typical medications. *Id.* He said that the migraine radiated from his forehead to the posterior portion of his neck and he rated his pain as 15/10. *Id.* at 587. Heather Pardun, APRN gave Zuhlke shots of Demerol 25

---

[3] The Global Assessment of Functioning ("GAF") score is the clinician's judgment of the individual's overall level of functioning. *See* Diagnostic and Statistical Manual of Mental Disorders, DSM—IV-TR, 32 (4th ed. 2000). A new edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) was released in 2013 and replaced the DSM-IV. A GAF score of 71-80 indicates average functioning. *Id.* at 34. The DSM-V "no longer uses GAF scores to rate an individual's level of functioning because of 'its conceptual lack of clarity' and 'questionable psychometrics in routine practice.'" *Alcott v. Colvin*, No. 4:13-CV-01074-NKL, 2014 WL 4660364, at *6 (W.D. Mo. Sept. 17, 2014).

ml and Phenergan 25 ml, which provided no pain relief. *Id.* at 589. She then administered 6 ml of morphine intravenously, which brought his pain down to a 12/10, and then .5 mg of Dilaudid intravenously, which brought his pain down to an 8/10. *Id.* Dr. Winkelbauer advised Zuhlke to continue taking Propranolol 80 mg daily and trazodone 50 mg up to five times per day for migraines. Zuhlke was discharged on July 7, 2015. *Id.* at 561.

Dr. Adams evaluated Zuhlke on August 10, 2015. *Id.* at 613. Adams noted that Zuhlke's headaches never went away completely, and he did respond somewhat to the medication regimen although the response is incomplete. *Id.* at 613. Dr. Adams gave Zuhlke a shot of Phenergan 50 mg. *Id.* at 614. Dr. Adams advised Zuhkle against frequent use of LorTabs and Fioricet and encouraged to use Maxalt or Rizatriptan and Toradol. *Id.* Dr. Adams told Zuhlke to continue his medication regimen including 80 mg Propranolol daily, but to stop Verapamil 120 mg daily because of adverse side effects. *Id.* To better manage depression and pain concurrently, Adams prescribed Cymbalta 60 mg and Zoloft 25 mg daily. *Id.*

On February 8, 2016, Zuhlke, together with his wife, visited Dr. Adams, who noted that Zuhlke "[could] go a day or so without having severe headaches though hardly ever [went] a day without having some headache." *Id.* at 655. Severe headaches which disturbed Zuhlke's activity and were very noticeable to his wife and occurred at least two or three times per week. *Id.* Dr. Adams advised Zuhlke to continue his chronic pain management with Duloxetine 60 mg, Sertraline 50 mg, and Propranolol 160 mg, all daily. *Id.* at 656. Additionally, on February 8, 2016, Dr. Adams noted "[Zuhlke] is probably capable of light duty employment but will regularly experience unpredictable intermittent

headaches which will interfere with his ability to perform physical labor or continuous activity." *Id.* at 636.

On April 11, 2016, Dr. Adams noted that Zuhlke "has done a little bit better with his headaches at times." *Id.* at 652. Dr. Adams noted that Zuhlke awakened with headaches in the middle of the night, and headaches occurred when Zuhlke exerted himself. *Id.* Dr. Adams further noted that Zuhlke described a "bad headache several days ago with pounding and throbbing." *Id.* Dr. Adams described Zuhlke's headaches as "mixed type headaches with cervicogenic referred source and secondary migrainous transformation" that should continue to be treated with propranolol 160 mg and Cymbalta 60 mg, both daily. *Id.* at 653. Dr. Adams said Zuhlke should always have Maxalt or Imitrex on hand to take with Toradol, in addition to nasal Imitrex or Zomig, and Phenergan as the "last resort" in the event of breakthrough headaches. *Id.*

At a July 11, 2016 appointment with Dr. Adams, Zuhlke stated he recently had two "longer" headaches (three and four-day durations, respectively). *Id.* at 650. Dr. Adams characterized Zuhlke's recurrent migraines as "very complex, mixed type post-traumatic headaches." *Id.* at 651. Dr. Adams told Zuhlke to "maintain his complex medication regimen" and his "chronic pain management" including Cymbalta daily, trazadone 50 mg at bedtime, Zoloft 100 mg, and propranolol 80 mg. *Id.* Dr. Adams administered a shot of B12, thiamin 100mg and folic acid 5 mg to help with vitamin deficiency, neuropathy, and chronic fatigue. *Id.*

Zuhlke visited Dr. Adams on October 31, 2016, and Dr. Adams noted that Zuhlke had migraines up to twice per week and a more constant headache nearly every day. *Id.* at 646. Dr. Adams advised Zuhlke to "continue treatment for chronic headaches including

Trazodone, Singulair, Propranolol, Cymbalta, Relpax, Phenergan, etc.," and was advised to have Zomig 5 mg on hand up to three times per week for breakthrough headaches. *Id.* at 647.

At a December 27, 2016 visit to Dr. Adams, Zuhlke stated that his headaches were "stirred up" due to the winter weather. *Id.* at 643. Dr. Adams described Zuhlke as tired, rundown, fatigued, lacking energy, zest, and ambition. *Id.* Dr. Adams told Zuhlke to continue his treatment regimen for migraines. *Id.* at 644. Dr. Adams prescribed Wellbutrin 150 mg SR for chronic fatigue and to regulate sleep and Gingko 120 mg to increase energy and combat coldness in the extremities. *Id.* Dr. Adams advised Zuhlke to take Propranolol 160 mg in the evening rather than morning to lessen fatigue and regulate sleep. *Id.*

Zuhlke saw Dr. Adams on March 6, 2017, and Dr. Adams stated that Zuhlke continued to have variable recurrent headaches; he usually had some headache every day. *Id.* at 639. Dr. Adams prescribed Effexor 150 mg XR to control pain in place of Cymbalta, to be taken concurrently with Zoloft. *Id.* at 640. Dr. Adams advised Zuhlke to continue his chronic pain management regimen, and he additionally prescribed Cefdinir 300 mg daily for a week. *Id.*

On May 1, 2017, based on his medical treatment of Zuhlke, Dr. Adams estimated that Zuhlke would miss two to three days of work per week, and eight to twelve days of work per month. *Id.* at 657. Dr. Adams acknowledged that these work absence estimations were "made to a reasonable degree of medical certainty." *Id.* at 657.

### D.  The ALJ's Findings

The ALJ found that Zuhlke was not disabled.  *Id.* at 32.  The ALJ undertook the standard five-step sequential process for analyzing and determining disability.  *Id.* at 14-32.  The ALJ found that Zuhlke had not engaged in substantial gainful activity since October 7, 2014, the alleged disability onset date.  *Id.* at 14.  The ALJ agreed with the finding that Zuhlke suffered from degenerative disk disease, history of neck fracture C2, status post fusion January 2014, migraines, carpal tunnel syndrome, obesity, and tobacco use, and that all of these impairments were severe.  *Id.*

The ALJ concluded that Zuhlke's impairments do not meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).  Filing No. 9 at 16.  The ALJ found that Zuhlke's degenerative disk disease did not meet the mandates of listing 1.04, his carpal tunnel syndrome did not meet the requirements of listing 1.08, and he did not demonstrate neurological deficits under listing 11.01.  *Id.* at 16-17.  Further, the ALJ noted that Zuhlke was 5 feet, 11 inches tall and 235 pounds, but his obesity did not meet a listing when considered in conjunction with his other impairments and did not alone equal a listing.  *Id.* at 17.

The ALJ determined that Zuhlke had residual functioning capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b).  Filing No. 9 at 16-17.  As such, he could lift and carry 20 pounds occasionally and 10 pounds frequently, sit six hours out of an eight-hour workday, stand six hours out of an eight-hour workday, and walk six hours in an eight-hour workday.  *Id.*  The ALJ found the following additional limitations: could use his hands frequently, but not constantly, handling, fingering, feeling; could climb,

balance, stoop, kneel, crouch, crawl only occasionally; should avoid exposure to cold, heat, humidity, vibration, hazards, heights, and moderate noise. *Id.*

The ALJ acknowledged that the claimant's medically determinable impairments could cause some of the alleged symptoms and their severity. *Id.* at 20. However, the ALJ did not afford great weight to the claimant's testimony because his "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . ." *Id.*

Similarly, the ALJ granted little weight to the Supplemental Information form submitted by the claimant's wife, Jill Zuhlke. *Id.* at 19. Mrs. Zuhlke stated, inter alia, that "[the claimant] either has a migraine, is getting over one, or does not feel good due to his medication," that the claimant "is normal and is up" for only a few hours on a couple of days per week, that she brings the claimant his food in bed, and that the claimant has difficulty concentrating and maintaining attention. *Id.* at 19-20. The ALJ stated that "[Mrs. Zuhlke's] observations are largely unsupported by the medical evidence of the record," so she discounted Mrs. Zuhlke's allegations regarding the limiting effects of the claimant's impairments. *Id.* at 20.

The ALJ gave little weight to those opinion/treatment records of Dr. Adams dated prior to the time the claimant reached maximum medical improvement, only some weight to Dr. Adams's opinion/treatment records made at the time the claimant reached maximum medical improvement because "Dr. Adams's opinion that the claimant needs frequent rest breaks every 30 minutes is too extreme for intermittent headaches," and little weight to Dr. Adams's opinion that the claimant's headaches would negatively impact

his ability to pursue meaningful, productive work because "there are no treatment records from Dr. Adams to substantiate this opinion." *Id.* at 23, 25, 27.

Contrarily, the ALJ granted substantial weight to the assessments of Drs. Jerry Reed, M.D., Robert Roth, M.D., Patricia Newman, Ph.D., and Rebecca Braymen, Ph.D., all State agency medical consultants who never saw the claimant in person, because "[these medical consultants] are acceptable medical sources and their opinions are consistent with the record as a whole . . ." *Id.* at 29. Drs. Reed and Roth determined that the claimant could perform light work, and Drs. Newman and Braymen determined that the claimant did not meet or medically equal any listing because, inter alia, "[the claimant] also stated that his headaches had gotten better." *Id.* As such, the ALJ found that Zuhlke was not precluded from work within the described RFC. *Id.*

### E. Vocational Expert's Relevant Testimony at the ALJ Hearing

A vocational expert also testified at the hearing. *Id.* at 66-74. She addressed the issue of whether a younger worker with a high school education could perform light work. *Id.* at 67, 68. The vocational expert was asked to assume the claimant could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds, only used his hands frequently (not constantly for handling, fingering, feeling), could occasionally do postural activities such as climbing, balancing, stooping, kneeling, crouching, crawling, whose environment must "avoid concentrated exposure to cold, heat, humidity, noise, vibration, and hazardous heights or equipment," and who could tolerate moderate but not excessive noise. *Id.* at 71-72. The vocational expert testified that, with these restrictions, there were indoor jobs such as that of an information clerk, routing clerk, or furniture rental clerk that a claimant could perform. *Id.* at 72. The vocational expert further testified that at least

fifty percent of unskilled, light jobs were consistent with the hypothetical, and at least seventy-five percent of sedentary jobs were consistent. *Id.* at 72-73. She testified that such sedentary jobs that a claimant with the above restrictions could perform included call-out operator or document preparer. *Id.* at 73. The vocational expert further testified that, if Dr. Adam's estimation that Zuhlke's migraines would cause him to miss between eight and twelve days of work per month were considered credible, Zuhlke would "would not be able to perform any of his past work" or any of the light or sedentary jobs that she cited. *Id.* at 74.

### F. Issues on Appeal

In this appeal, Zuhlke alleges: (1) that the ALJ erred in failing to properly evaluate whether he medically equaled listing 11.02 due to the severity and frequency of his migraine headaches; (2) that the ALJ erred in failing to provide good reasons for the weight afforded to his treating neurologist's opinions; and (3) that the ALJ was an inferior officer not appointed in a constitutional manner, which requires the ALJ's decision to be vacated and the claim remanded and decided by a new ALJ that was properly appointed.[4]

## II.   DISCUSSION

### A. Law and Analysis

#### 1. Standard of Review

When reviewing a Social Security disability benefits decision, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the

---

[4] This Court has already decided the issue of whether an ALJ is an inferior officer not appointed in a constitutional manner. *See* Memorandum and Opinion at 13, *Hernandez v. Berryhill*, No. 8:18CV274 (Neb. Mar. 14, 2019) ("The court finds that [the claimant's] argument that the ALJ was an inferior officer not appointed in a constitutional manner is untimely. While [the claimant] argues that the claim was not forfeited or waived even though it was not presented to the ALJ . . . this argument is unpersuasive.").

Commissioner. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court's review is limited to an inquiry into whether there is substantial evidence on the record to support the findings of the ALJ and whether the ALJ applied the correct legal standards. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011); *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). Substantial evidence means something less than a preponderance of the evidence, but more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Moore v. Astrue,* 572 F.3d 520, 522 (8th Cir. 2009) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003)); *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938). However, this "review is more than a search of the record for evidence supporting the [ALJ or Commissioner's] findings," and "requires a scrutinizing analysis." *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008). In determining whether there is substantial evidence to support the Commissioner's decision, this court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Finch v. Astrue,* 547 F.3d 933, 935 (8th Cir. 2008).

### 2. Sequential Analysis

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a)(4). The determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and his or her age, education and work experience. *Id.* At step one, the claimant has the burden to establish that he or she has not engaged in substantial

gainful activity since his or her alleged disability onset date. *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013). At step two, the claimant has the burden to prove he or she has a medically determinable physical or mental impairment or combination of impairments that significantly limits his or her physical or mental ability to perform basic work activities. *Id.* At step three, if the claimant shows that her impairment meets or equals a presumptively disabling impairment listed in the regulations, he or she is automatically found disabled and is entitled to benefits. *Id.*[5] If not, the ALJ determines the claimant's RFC, which the ALJ uses at steps four and five. 20 C.F.R. § 404.1520(a)(4).

A claimant's RFC is what he or she can do despite the limitations caused by any mental or physical impairments. *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); 20 C.F.R. § 404.1545. The ALJ is required to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. *Papesh v. Colvin,* 815 F.3d 1126, 1131 (8th Cir. 2015). The RFC must (1) give appropriate consideration to all of a claimant's impairments; and (2) be based on competent medical evidence

---

[5] If the claimant is found to suffer from an impairment that is listed in the Appendix to 20 C.F.R. Part 404, Subpart P ("the listings") or is equal to such a listed impairment, the claimant will be determined disabled without consideration of age, education, or work experience. 20 C.F.R. § 416.926. Impairment is medically equivalent to a listed impairment in appendix 1 of Subpart P of Part 404 if it is at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 416.926(a). *See also* 20 C.F.R. § 416.929(d)(3) (if the symptoms, signs, and laboratory findings of the claimant's impairment are equivalent in severity to those of a listed impairment, the claimant is disabled). When considering migraine headaches, ALJs should evaluate whether the claimant medically equals the listing found in 20 C.F.R., Part 404, Subpart P, Appendix 1, § 11.02, which is Epilepsy. *See Mann v. Colvin*, 100 F.Supp.3d 710, 719-720 (N.D. Iowa 2015). An ALJ must proceed beyond naming the relevant listing; the ALJ must explain why the claimant does not medically equal the relevant listing. *See Hesseltine v. Colvin*, 800 F.3d 461, 466 (8th Cir. 2015) (when the ALJ concludes that the impairment does not medically equal a listing, he or she must provide reasons for that conclusion, otherwise there is insufficient evidence to support said conclusion).

establishing the physical and mental activity that the claimant can perform in a work setting. *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016).

At step four, the claimant has the burden to prove he or she lacks the RFC to perform his or her past relevant work. *Cuthrell*, 702 F.3d at 1116. If the claimant can still do his or her past relevant work, he or she will be found not disabled; otherwise, at step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.; see Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010).

This Court finds that the ALJ erred in failing to discuss medical equivalence (as discussed above in footnote 5) for Zuhlke's migraines, which were the main impairment that led to his disability. No acceptable medical consultants from the Social Security Administration provided an opinion regarding whether Zuhlke's migraines medically equaled listing 20 C.F.R., Part 404, Subpart P, Appendix 1, § 11.02.[6] Substantial evidence supports a finding that Zuhlke's migraines are medically equivalent to a listed disorder. The record demonstrates that Zuhlke's migraines were frequent and severe and that he reported and sought treatment for his symptoms from his physicians throughout the relevant period. Zuhlke's migraine pain was so severe that he sought emergency room treatment and regularly received intravenous pain management

---

[6] As explained in footnote 5, there is no listing that refers to migraines, so ALJs should evaluate if migraines are medically equivalent to epilepsy as found in listing § 11.02. To meet the requirements of § 11.02, the record must demonstrate medical evidence of the claimant's epilepsy which is documented by a detailed description of the typical seizure and characterized by the following: (1) generalized tonic-clonic or dyscognitive seizures occurring at least one a month for at least 3 consecutive months despite adherence to prescribed treatment; or (2) generalized tonic-clonic or dyscognitive seizures occurring at least once every 2 months for at least 4 consecutive months despite adherence to prescribed treatment and a marked limitation in physical functioning, understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, or adapting or managing oneself. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.02.

medications. The record shows that Zuhlke complied with prescribed regimens for several migraine pain management medications. There is nothing in the record to show that a medication treatment regime would fully remedy his chronic condition.

A migraine history as extensive as Zuhlke's required the ALJ to conduct a thorough analysis under listing § 11.02 and seek an acceptable medical source to provide an opinion regarding whether Zuhlke's migraines medically equaled listing § 11.02. Even if the ALJ had considered migraines under § 11.02, the ALJ would have had to thoroughly explain why Zuhlke's migraines did not equal the listing.

This Court finds that the severity and duration of Zuhlke's migraine symptoms were cause for the ALJ's consideration of the migraines under listing § 11.02, and since the ALJ did not cite any particular listing and did not discuss medical equivalence for Zuhlke's migraines (i.e., the impairment that resulted in potential disability), it remains unclear whether Zuhlke's migraines medically equal listing § 11.02.

Consequently, this Court concludes that the evidence clearly supports the finding that Zuhlke's migraines are an impairment which medically equal the listing found in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.02. An analysis of the record indicates that there is substantial evidence that Zuhlke's symptoms, signs, and laboratory findings are equivalent to those listed in § 11.02, so this Court finds Zuhlke is presumptively disabled without further consideration of his age, education, or work experience.

However, this Court will address the remaining issues in the alternative.

### 3. Treating Physician

The ALJ must give "controlling weight" to a treating physician's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence." *Papesh*, 786 F.3d at 1132. Even if not entitled to controlling weight, a treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. *Id.* The regulatory framework requires the ALJ to evaluate a treating source's opinion in consideration of factors such as length of treatment, frequency of examination, nature and extent of the treatment relationship, support of opinion afforded by medical evidence, consistency of opinion with the record as a whole, and specialization of the treating source. *Id.; see* 20 C.F.R. 404.1527(c)(2). "When an ALJ discounts a treating [source's] opinion, he should give good reasons for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007); *Jenkins v. Apfel*, 196 F.3d 922, 924-925 (8th Cir. 1999) (stating the ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions).

The ALJ failed to properly credit the opinions of Zuhlke's neurologist. There is substantial evidence from Zuhlke's treating physician that he suffers from physical impairments (i.e., migraines) that interfere with his ability to work. The opinions presented by the Commissioner's consulting physicians and psychologists do not counter these opinions. The psychologist's opinion relied partially on the fact that Zuhlke stated that his headaches had improved. This opinion relied on an assumption of efficacious treatment that was not supported in the evidence. In this case, the ALJ did not properly assess the weight of the neurologist's opinions. The ALJ did not comply with requirements to consider the length of the physician's treatment (over two years at the time of the hearing), frequency of examination (ten office visits), consistency of opinion with the record as a whole (the physician's opinions that, inter alia, Zuhlke's migraines could interfere with

work, require frequent breaks, and would result in unscheduled absences from employment are not inconsistent with anything in the record), and specialization of the treating source (the physician is a board-certified neurologist). Because the ALJ failed to provide adequate reasons supported by substantial evidence for the weight afforded to the neurologist's limitations, the ALJ's decision should be reversed.

This Court finds that Zuhlke is clearly disabled because the ALJ failed to give controlling weight to Zuhlke's treating physicians' opinions. The professional opinion of Zuhlke's neurologist was consistent with other substantial evidence within the record and was well-supported by medically acceptable clinical and laboratory techniques. The ALJ failed to present substantial evidence that Zuhlke is able to work. In fact, the record indicates quite the opposite: substantial evidence demonstrates that Zuhlke's persistent, immobilizing migraines constitute an impairment that precludes gainful employment. The ALJ discounted credible, informed medical assessments contained in the record, ergo this court finds Zuhlke disabled. These findings are clearly supported by the medical records and by his treating physicians.

### III.    Conclusion

The clear weight of the evidence points to a conclusion that Zuhlke has been disabled since his alleged onset date of October 7, 2014. Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate. *See Hutsell v. Massanari*, 259 F.3d 707, 709 (8th Cir. 2001). Accordingly,

IT IS ORDERED that the plaintiff's motion to reverse (Filing No. 13) is granted; that the defendant's motion to affirm (Filing No. 20) is denied; and that the decision of the

Commissioner is reversed and this action is remanded to the Social Security Administration for an award of benefits.

Dated this 31st day of July, 2019.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge